May it please the court, Katie Shepard for Mr. Vernon Nelson. The primary issue in this case is whether the Border Patrol agents had reasonable suspicion to stop Mr. Nelson's tractor trailer about six miles north of the fixed immigration checkpoint on I-35 outside of Laredo, Texas. The answer is no because this was a roving patrol stop and the agents lacked reasonable suspicion under the Brignone-Ponce factors. What do you do with the with the seal that was on the vehicle that the officers thought was unusual? Yes, so the agent did testify that the seal was unusual given what he thought he might have seen inside the trailer, but overall the agent's testimony indicated that he was very unsure about what he saw. He was adamant that he didn't know for sure what he'd seen. He thought it might contain bundles, but he thought it might not contain bundles. He testified about how in his experience there isn't any standard size for pallets. Sometimes they're larger, sometimes they're smaller. He thought there might be one or two pallets, but he just really wasn't sure. He also testified about how the scans aren't perfect, they're not exact, and he testified about his experience when he'd been wrong in the past. He gave a specific example where he thought there were bundles, but it turned out that it was yeast not narcotics. Another fact too was that when he got to the stop he requested an additional seal from an agent back at the checkpoint just in case there was nothing inside the trailer. So overall his testimony indicates that he had a hunch, but he didn't have reasonable suspicion because he just really wasn't sure what he saw. And also under the Brignone-Ponce factors and the totality of the circumstances, there were a lot of non-suspicious facts in this case. For example, the behavior of the driver clearly weighs against reasonable suspicion in this case. There's nothing to indicate that when Mr. Nelson went through the checkpoint he was nervous in any way. They didn't have any doubts about his citizenship. He consented to the scan. The agent testified about how the out-of-state registration was typical. There was nothing unusual about that. There's nothing unusual about a single man driving a tractor trailer on I-35 to the Laredo. This didn't happen during a shift change, and there was no evidence that when the in any way. Also there wasn't evidence supporting reasonable suspicion on three other factors, the characteristics of the area or the usual traffic patterns or any information about recent illegal activity. Under Brignone-Ponce, it does have to be evidence of recent illegal activity in the area, and in this case the agent didn't offer any testimony that there was recent illegal activity in the area. Although the magistrate judge and the government in its brief on appeal has pointed to this court's Munoz-Martinez case, that case is nine years old at this point, and also in that case the agent himself testified at the suppression hearing about recent illegal activity in the area which were missing from this case. To go back to the this being a roving patrol, there are three reasons why this was a roving patrol as opposed to a extension of the checkpoint in the secondary area. The circumstances of the stop, the agent's testimony, and also a comparison to Supreme Court precedent. In this case, as I mentioned, Mr. Nelson did go through the checkpoint and said he was a citizen, but he did not testify he asked he was asked to consent to a scan and he did, and then he was allowed to leave the checkpoint without any indication from the agents that they wanted to stop him. Then two agents decided that they did want to pursue him, so they got in their separate patrol vehicles and drove down the highway to get him, and once they caught up with him, they activated their emergency lights and pulled him over on the side of the road. So under those... Do we put no weight at all on the fact that the secondary staging area was under construction, so that normally they would have maybe sent him there, but this is the equivalent of a secondary area, but only because of the to consider it from the perspective of the driver. So in Martinez-Fuerte, the Supreme Court differentiated extensively between the far less intrusive checkpoint stops and the more intrusive roving patrol stops like in Brignone-Ponce, and the court talked about how a checkpoint has a fixed location, and it has visible signs of authority, and other drivers are being stopped, which makes it more reassuring for the drivers, and the court talked about how the hallmarks of a checkpoint make the checkpoint experience much less frightening and less annoying and less surprising to drivers. But in this case, because Mr. Nelson left the checkpoint without any indication that they wanted him to stop and was eventually stopped six miles down the road, the roadside stop is lacking those it doesn't matter that there was construction that prevented the agents from doing a secondary inspection that they would normally do without the construction, because from Mr. Nelson's perspective, this was a roadside stop that, you know, they got information about him from the checkpoint, but from his perspective, he was on his way and, you know, what didn't happen in the context of the checkpoint anymore. And I would also point out that in Brignone-Ponce itself, there did treat that stop as a roving patrol. The agents spotted the driver near the permanent checkpoint and pulled him over, but because they didn't have the typical checkpoint experience, that was a roving patrol in that case as well, just like in this case, or similar to this case. I would also mention the case that's cited in the government's brief, Macias, and the government cites that case for a delayed checkpoint stop when the driver had done a U-turn before the checkpoint. And in that case, the court actually did apply the Brignone-Ponce factors. The drivers had approached in about 300 to 350 yards away from the checkpoint, they did a U-turn, the agents pursued them and caught up to them, and the court did apply the Brignone-Ponce factors in that case as well. As far as the proximity factor of the Brignone-Ponce factors, the government didn't meet its burden on that factor in this case. The court's cases have explained many times that there's no bright line rule when it comes to the proximity factor, and that the proximity factor only weighs in favor of reasonable suspicion when there is evidence from which an agent could reasonably conclude that this particular vehicle that they're interested in originated its journey at the border. But in this case, we don't have any particular evidence about Mr. Nelson's tractor trailer, we just have the general information that would apply to any driver on I-35 outside of Laredo. And this court's cases have expressed, as well as the Supreme Court has expressed concern about the impact on innocent drivers in the border areas if a proximity factor applies based on a numerical distance from the border. And so in this case, because the I-35 is a direct route out of Laredo, a populous city, to places like San Antonio and Dallas, the court should not weigh the proximity factor in favor of reasonable suspicion in this case. But the vehicle had been observed constantly, isn't that right? From the border checkpoint to the point of the stop? Yes, they first made contact with the vehicle at the checkpoint, which I believe is at mile marker 29 outside of Laredo on I-35. And then the agents were able to catch up to the tractor trailer about six miles later around mile marker 35 or 36. So it is close to the border as far as it being near Laredo and near the border in terms of because that would subject all of the regular legitimate traffic in the border area to this suspicion when there's plenty of legitimate traffic that would, for example, take I-35 to San Antonio or Dallas. So because there wasn't anything particular about this case, for example, in this court's Cardona case there, there was a tractor trailer about 40 to 50 miles from the roads. And so in that case, I'm sorry, it wasn't actually a tractor trailer. It was a midsize passenger car that was suspicious because it's 90% hunting jeeps and ranching trucks. And so that caused the particular vehicle to have some suspicion for the agents to rely on rather than just general traffic in the area. What was the time lapse from the initial engagement at the border to the ultimate stop on I-35? We're talking about in miles, but how much time lapsed? Yeah, I'm not sure the record has a precise timeline, but assuming the tractor trailer was driving regular highway speeds, then I would think it would have been under 10 minutes, maybe 5 to 10 minutes. But he did testify about the mile markers. So we do have that distance of six. We asked the question of proximity to the border. We're talking about someone who has been stopped at the border, has consented to essentially the x-ray, and then has been gone, departed for five minutes, six minutes, and then has stopped again. When you frame it in terms of time lapse and relationship to the border, it seems to me that you're far more, you're much closer to the border and putting it in the matrix of a busy I-35 and the further you move away from the border, the greater the risk of stops, unlawful stops, etc., etc., of a high traffic area. What do you say to that in terms of the proximity of the border, the time lapse? Well, he was stopped originally at an immigration checkpoint that's not right on the border. It's at the mile marker 29 north of Laredo on I-35. But you also earlier suggested that we should look at this from the perception of the person being arrested. That has been the suggestion. In terms, again, of the time lapse, he knows that they know that there's small packages in there, and yet you have a sealed trailer. And then he leaves, and then within five or six minutes, he's pulled over again. Looking again from the perception of the driver being detained, that calculus shifts, doesn't it? How do you handle that? Well, when I was talking about the perspective of the driver, that was in the context of whether it was a roving patrol or a checkpoint stop. But as far as proximity to the border, the court's cases have talked about how there isn't any sort of bright line rule. And what the test is, is whether an agent has reasonable suspicion that they think the vehicle originated its journey at the border. Or in some cases, the court has put it as the vehicle in question recently crossed the border. Does it really matter what the man thought? The being arrested, he is either proximate to the border or he's not. And you'd object to lay the proximity to the border as a matter of lapse of fairly short period of time in terms of how a highway strikes me. That's the difficulty I'm having with the case. Well, I think when it comes to proximity, that's a factor that the agents can rely on to have reasonable suspicion. They have particular information about a vehicle. So for example, in the Jackineau case, the court had information that the agents knew a vehicle, the timeline worked out where the vehicle had alerted on a sensor very close to the border, much less than 50 miles in a very remote area. And then based on the timeline, they knew they have reason to believe that it was the same vehicle that showed up several miles, many miles later. But that was something particular to that vehicle rather than just a bright line rule that this court has rejected of any vehicle, excuse me, any vehicle 50 miles is automatically suspicious just because they are within a numerical distance of the border, because that would subject every driver on the border, even in populous areas like Laredo to that suspicion. And I see that my time has expired, but I have some time for rebuttal. Thank you. Yes, Ms. Sheppard, your time has expired. Thank you, Ms. Wilson. You have to unmute. Oh, sorry. I'm unmuted now, I think. I'm sorry about that. The district court correctly denied Nelson's motion to suppress both the magistrate judge. Ms. Wilson, I have a question for you first, which is how many Fifth Circuit arguments for you so far? I don't know. Do you? Quite a few. I don't keep score. I'm just curious. Sometimes I ask counsel that and we hear from frequently. So I'm just wondering. I don't know. You don't have an estimate? But any event, both the magistrate judge and the district court found that Agent Stoffager had reasonable suspicion to believe that criminal activity was afoot. And therefore, either an investigatory stop or a referral to secondary was justified. This was more than a hunch. Reasonable suspicion was established at the checkpoint. During the scan, the agent initially thought he saw a small number of bundles that could have been tarps or equipment. This everything was fine in his view until he saw the seal, the cable seal at the back of the trailer. And a seal, as Agent Stoffager told us, is inconsistent with hauling personal equipment. Instead, a seal is used to protect cargo. And therefore, that's where his suspicion was raised. But due to the configuration of the checkpoint, due to the construction, he couldn't refer Nelson to secondary inspection. He could have also, however, told him as much. And in other words, that he wants to go further with this. In other words, they just turned him loose. At that point, they said nothing to him and turned him loose and said nothing. In other words, if you're going to refer him, what would happen for the construction? How would that have gone down? For the construction? Agent Stoffager testified that Nelson would have been referred to secondary, but he was unable to communicate with him during the scan. And apparently nobody was on the ground giving Nelson signals. So he immediately, as soon as the scan finished, he immediately got with a ground agent and they went to get him as soon as possible. And that's the six miles north of the checkpoint where he was stopped. So normally what happened, and they say, when you refer the driver to the checkpoint, what do you do? You notify the checkpoint, right? I mean, you refer him to a secondary. That's correct. And the agent notifies the people that this is what's going on. And they didn't step out and detain him or what? At the checkpoint, nothing happened. Nelson continued to drive through. And because Agent Stoffager was unable to communicate that he needed to stop, Nelson meaning, he was able to go forward. And so then they chased him down the road six miles later. I mean, that's when they caught up with him six miles later. So what happened there is the suspicion grew at the checkpoint. And as I said before, originally he thought that maybe he was, Nelson was transporting some cargo because of the dolly and the small amount of bundles. But only when they pulled him over did the suspicion grow. And that was based on the bill of lading. And the bill of lading showed several inconsistencies that raised the suspicion further. And those inconsistencies were Kellogg was misspelled. There were two seals instead of one. The seal on the second one, there was a typographical error, so to speak, that's what they said. And he supposedly had five pallets of cereal, which did not comport with what Agent Stoffager had seen on the scan. And so Nelson was given the option of consenting to a search of the trailer or getting a dog. And he opted for the latter. And that's what happened in relation to the roadside conversation. So there was approximately five minutes he testified that they had to wait for the dog. And both the magistrate judge and the district court judge here found that it was either an investigatory stop or that it was an extension of the secondary inspection. The judges did not rely on Bregoni Ponce, as Mr. Nelson says. This was not a traditional roving patrol stop. Unlike Bregoni Ponce, the government here challenges that it's a roving patrol stop. In Bregoni, the government agreed that it was a Here, the reasonable suspicion developed at the checkpoint, whereas in Bregoni, they were pulled over simply because they were Mexican. So the facts are very different. And as we know, a traditional roving border patrol is you think of an agent or two sitting in the highway, sitting alongside the highway, seeing if any cars develop or things like that. And under Bregnoni, no single factor is determinative. And you can't employ a divide and conquer analysis. Instead, it's based on the totality of the circumstances. And even if you were to apply Bregnoni here, you have several factors. You have, as we've discussed, the 29 miles from the border, the areas well known for trafficking. While the magistrate judge may have cited a couple cases, one of which, as I recall, was older, these are judges that have been sitting down there in Laredo for a while. They could have made the statement in their opinion, and it would have been fine. It would have been just common sense. Also, here we have an agent who's very experienced. Agent Stauffiger had nine years, all of which were spent at the Laredo North checkpoint, except for a two-year detail to DEA. So he's very, very familiar with this area. So the reasonable suspicion here was based on the totality of the circumstances this agent Stauffiger's experience, his specialized training. And constitutional reasonableness doesn't depend on an agent's motivations. Instead, you simply cannot delve into the subjective intent. So in this case, whether this court wants to employ an investigatory stop or a secondary inspection, either way, Nelson should have been, I mean, Nelson, there was reasonable suspicion to stop Nelson. As the district court also properly found, there was no Fifth Amendment violation. Once again, the totality of the circumstances controls. And here, those proved that Nelson wasn't under custodial interrogation, and Miranda did not apply. The district court had the benefit, not only, and the magistrate as well, of not only agent Stauffiger's testimony, but even more importantly, the short video where they could hear and see agent Stauffiger question Nelson. As the district court, excuse me, as the magistrate court pointed out, that questioning lasted just a little over two minutes. And applying the right factors, the courts concluded that the stop was brief. It was on the side of the road in plain view. The questions were not accusatory. The magistrate judge even found that it was cooperative. Nelson was not physically, excuse me, restrained or even handcuffed. Instead, he was leaning against one of the agent's cars. And the agent's statements didn't suggest Nelson would be automatically arrested. Even if somebody isn't free to leave, it doesn't mean they're under arrest. And agent Stauffiger testified that he didn't think he asked Nelson about the anomalies in the back of the truck or the bill of lading. And the video shows that that conversation never occurred either. And as the magistrate court found that based on the video, there were no further substantive questions were asked before Nelson was arrested. So based on the right factors, there was no, excuse me, Fifth Amendment violation here. And unless the court has- Well, the question that was put to him was that we want to bring in the dog and he said, bring in the dog. And he said, if the dog doesn't detect you're free to go, is that what happened? Well, what we have where the video starts, it's agreed that there was a few minutes exchange between them. Agent, excuse me, agent Stauffiger did not tell him he was under arrest. And in fact, they weren't certain he was actually carrying something illegal. Another agent brought a seal, another seal that in case nothing was found, that he could be sent on his way. The testimony doesn't bear out that he was told that he would be arrested, but it was along the lines of, nothing's found, you can go on your way. That's essentially what the record shows. If nothing's found, you go on your way. But implicit in that is that you're not free to go now, is that or not? Well, agent Stauffiger testified that Mr. Nelson was detained. He definitely said that in the video. There's no dispute about that. But that isn't the standard here. Instead, the standard is the right factors. And those are employed to determine whether somebody is in custody. It's a totality. It's not delving into- I understand that's a brief detention, but it's still part of the larger picture of whether he is in custody. And it's kind of step one toward custody, not custody. Well, it's certainly a consideration, no question about it. But that's why one of the benefits here, or I should say strengths here, is the fact that he wasn't taken into a car by himself and handcuffed and questioned in there. Instead, it was alongside I-35. Judd Smith, do you have a question? I was going to ask you on this concept of delayed secondary inspection. You don't have any case law to support that. Is that right? In other words, we'd be extending our Fourth Amendment jurisprudence if we acknowledge that particular concept here? Well, I looked and I looked and I looked, to me, this is an outlier. It's an unusual situation. There are cases, as Ms. Shepard discussed, where people try to purposefully avoid the checkpoint. One of those cases was, I think, you and Judge Higginbotham were on the panel in Freeman, where somebody turned on the road right before a checkpoint and the issue was essentially whether they're avoiding it or not. We have the thing, and I guess nobody else did here either, where there is construction and there's a delay. Okay. Anything else, Ms. Wilson? No, Your Honor. Okay. Ms. Shepard, you saved time for a bubble. Thank you, Your Honor. Just a couple of points. One is just to be clear that the information on suspicion analysis, because the agents didn't have that information until after they stopped outside of the road. So, as far as the Kellogg's misspelling and the number of pallets, that was not information that the agents had when deciding to stop. Also, as far as the issue of whether this was a well-known area for drug trafficking, all of these, the court's cases that I've relied on actual evidence in the record of it being a known smuggling route, not just a court case from nine years ago that says that. So, in this case, unfortunately for the government, they did not provide that. And so, I cannot count in favor of reasonable suspicion on the record in this case. And then, as far as it being a delayed checkpoint stop, I would just reiterate that under Tina Suerte, when the Supreme Court very carefully distinguished roving patrol stops, like in Verconi Ponce, from checkpoint stops, there was an issue in that case as well of a secondary inspection, but it didn't involve somebody leaving the checkpoint and being pulled over six miles later. As Judge Higginbotham said, from Mr. Nelson's perspective, he was free to go on his way and then he was pulled over. So, this was a roving patrol stop and the Verconi Ponce factors apply. And if there are no further questions, we would ask the court to reverse and remand for further proceedings. Thank you, Ms. Sheppard. Your case is under submission.